OPINION OF THE COURT
James A. Yates, J.
Albert King is charged with criminal possession of a controlled substance in the third degree. He has moved to suppress 55 vials of crack cocaine and two statements alleged to have been made by him.
In People v Hollman (79 NY2d 181 [1992]), the New York Court of Appeals reaffirmed the use of a four-tiered analysis (levels I-IV) to evaluate the propriety of police encounters with private citizens. (See, People v De Bour, 40 NY2d 210 [1976].) In addition, that Court and others have created a parallel hierarchy of police-observed drug activity, finding some actions to be the "hallmark” of illicit drug exchanges (People v McRay, 51 NY2d 594, 605 [1980] [glassine envelopes exchanged in a drug-prone area constitutes probable cause— level IV]), while other observations may merely provide reasonable suspicion (People v Gonzales, 86 AD2d 634 [2d Dept 1982] [officers’ knowledge of drug-prone nature of area, combined with defendant’s companion’s rejection of manila envelope offered to him upon seeing police car and defendant’s immediate throwing of envelope to ground after sighting officers provided reasonable suspicion — level III]), or less (Matter of Kevin W., 188 AD2d 301 [1st Dept 1992] [numerous exchanges of unidentified object for money in drug-prone location sufficient to justify a request for information — level I]).
This case presents a fact pattern in which a number of people approached and gave money to the codefendant. He then pointed to the defendant who engaged in "hand-to-hand” contact with those same people. Further, in one or two instances, the approaching individual appeared to put something in his or her mouth following the purported exchange. The officers making these observations were unable to determine what, if anything, the defendant passed to any of these individuals. The question for this suppression court is the proper classification of this activity under McRay (supra) and its progeny, followed by a determination of the appropriate concomitant level of police intrusion under De Bour (supra) and Hollman (supra).
*575 FINDINGS OF FACT
At the hearing, the People called two witnesses, Police Officers Joseph DeFelice and Anthony Antonucci. Both officers are credible witnesses to the extent indicated by the following findings.
On January 11, 1992, at approximately 10:00 p.m., Officer DeFelice and Officer Antonucci of the Port Authority Police were on foot patrol in the vicinity of Eighth Avenue and 41st Street in New York County. While the officers were positioned on the sidewalk in front of the Port Authority, they observed the defendant, Albert King, and Bernard Daise[1] directly across the street, on the eastern side of Eighth Avenue, between 41st and 42nd Streets. Officer DeFelice observed three to five people approach Mr. Daise and give him an unspecified amount of United States currency. Several of these people approached Mr. Daise with their money exposed. These individuals then approached the defendant, Albert King, who was standing approximately 15 feet away from Mr. Daise. Mr. King and these individuals then engaged in several "hand-to-hand” exchanges, in the words of the witness, but Officer DeFelice could not see what, if anything, the defendant gave these individuals.
Suspecting that Mr. Daise and the defendant, Albert King, were selling drugs, Officer DeFelice immediately repositioned himself in an observation post located on the second floor of the bus terminal, directly above the west side of Eighth Avenue between 41st and 42nd Streets.
Using his binoculars, DeFelice observed that Mr. Daise and Albert King were still standing approximately 10 to 15 feet apart from each other on the east side of Eighth Avenue between 41st and 42nd Streets. According to DeFelice, the area where Mr. Daise and the defendant were standing was "well-lit” by a street light, a newsstand and a parking lot located on the corner of Eighth Avenue and 42nd Street. There were other pedestrians crossing the street and milling about in the vicinity of the defendant and Mr. Daise at this time. Officer DeFelice was in the observation post, which was located approximately 75 feet away from where the defendants were standing, for approximately 15 minutes.
During the course of these 15 minutes, Officer DeFelice *576 observed six separate individuals approach Mr. Daise and give him United States currency. After each of these individuals gave their money to Mr. Daise, he immediately pointed over to Albert King. Each individual then immediately approached Albert King, who appeared to take something out of his jacket pocket. Mr. King then immediately engaged in a "hand-to-hand” transaction with each individual, whereby their hands would meet and the individual would withdrew his or her hand from the defendant’s with his hand clenched. Some of these individuals then placed their hands in their pockets, while at least one to two others put their hand to their mouth. The individuals then walked away from Albert King. Officer DeFelice described each of these encounters as brief, with no conversation occurring.[2]
Officer DeFelice described the area around Eighth Avenue and 42nd Street as a "drug prone location,” and testified that he has made 100 to 125 drug arrests in that area. According to Officer DeFelice, approximately 90% of these arrests were made in the vicinity of the southeast corner of Eighth Avenue and 42nd Street, which is the location where the defendant was arrested. This corner is bordered by a parking lot and contains no stores other than a newsstand.
After the sixth person completed a transaction with the defendant, Officer DeFelice and a fellow officer, Marshall, both in uniform, left the observation post and joined Officers Antonucci and Egbert, who were also in uniform, on the ground floor of the terminal. They crossed Eighth Avenue in the direction of the defendant and Mr. Daise, using moving traffic to conceal their identities. DeFelice and Marshall approached Albert King, while Antonucci approached Mr. Daise. Officer Egbert unsuccessfully pursued the individual who had engaged in the sixth hand-to-hand transaction with the defendant.
When Officer DeFelice was approximately 15 feet away from the defendant, the defendant looked in his direction and began walking towards 41st Street. Officer DeFelice called out "Yo”, at which point the defendant stopped walking and looked in his direction. DeFelice observed that Albert King’s hand was clenched. Without any preliminary inquiry, Officer DeFelice ordered the defendant to "open [his] hand”, and Mr. *577 King complied. Officer DeFelice then observed a vial with a purple cap in Mr. King’s palm, which appeared to contain crack cocaine. Officer Marshall, in the presence of Officer DeFelice, then searched Albert King and recovered 54 more vials with purple tops which appeared to contain crack cocaine from his jacket pocket. At no time did Officer DeFelice testify that he believed the defendant was carrying a weapon or that he feared for his safety.
The defendant allegedly made two statements to Officer Antonucci. Prior to the administration of Miranda warnings, but not in response to any police interrogation, the defendant stated at the time of arrest, "You only have me for possession, not sale.” The defendant repeated this statement at the precinct after the administration of Miranda warnings.
CONCLUSIONS OF LAW
Officer DeFelice did not have probable cause to arrest Albert King at the time he ordered him to open his hand. The Appellate Division, First Department, has held on several occasions that "[a] police officer’s observation of an exchange between [a] defendant and another individual of an undescribed object and United States currency is insufficient to establish probable cause to arrest.” (People v Wilson, 175 AD2d 15, 17 [1st Dept 1991], lv denied 78 NY2d 1015 [1991]; Matter of Kevin W., supra.) Moreover, that Court has emphasized that probable cause is not established even when such observations are made in a "drug prone” location. (People v Wilson, supra, at 18; Matter of Kevin W., 188 AD2d 301, supra.)[3]
The facts of the instant case bear a striking similarity to those in both Wilson (supra) and Kevin W. (supra), in which the First Department held that the observation of exchanges of money for an unseen object justifies only the minimal intrusion of a "right to request information.” In Wilson, the *578 officer was parked "some distance away” from the defendant, who was standing with three or four men in a "drug prone location.” (People v Wilson, supra, at 17-18.) He observed an unspecified number of individuals approach the defendant and hand him money. The defendant "then either made 'hand gestures’ or handed the individuals a small object” (at 16). The officer, whose vision was blocked by passerby and six intervening lanes of traffic, could not describe the object but "assumed [it was] cocaine or crack because of the way [the] defendant handed it [to the individuals]” (at 17).
The Court held that the officer’s observations did not provide him with probable cause to arrest, but rather with "a basis for a 'minimal intrusion of approaching to request information’.” (Level I; People v Wilson, supra, at 17, quoting People v De Bour, 40 NY2d, supra, at 223.) The Court found that the detective’s "observations were susceptible to innocent interpretation” (People v Wilson, supra, at 17-18), and emphasized that the officer never heard any of conversations between the defendant and the individuals who approached him and never observed a glassine, white envelope, "nor any other telltale sign of drug trafficking” (at 17).
In Kevin W. (supra), involving circumstances even more indicative of illicit activity than those present in Wilson (supra), the First Department reached an identical result. In Kevin W., uniformed officers observed the respondent, from a distance of 100 feet, standing against a fence with three or four people in a drug-prone location. (Matter of Kevin W, supra.) One of these individuals approached the respondent, who put his hand in his inside jacket pocket, removed an object, and handed it to the person who had approached him with a closed fist. (Supra.) This individual then gave the respondent " 'what seemed to be currency’ or 'some kind of paper’ ” (at 301). Respondent engaged in two identical transactions with two separate individuals over the course of the next two minutes. Before each person approached the defendant he looked up and down the block, moving his head from side to side. (Supra.) Again, the First Department found that the officers’ observations did not provide them with probable cause, but rather with a basis for a "request for information.” (Supra, at 302, citing People v De Bour, supra, at 223.)
The defendant, Albert King, like the suspects in Wilson (supra) and Kevin W. (supra), was observed engaging in a *579 number of hand-to-hand exchanges of an undescribed object for United States currency.
However, while Wilson (supra) and Kevin W. (supra) only sanctioned the minimal intrusion of "a request for information”, I find that there are additional indicia of criminality present in the instant case which supported a "founded suspicion” on the part of Officer DeFelice that "criminal activity [was] afoot.” (Level II; People v De Bour, supra, at 223.) Thus, Officer DeFelice would have been justified in exercising his common-law right of inquiry.
Two factors present in the instant case, which were not present in Wilson (supra) or Kevin W. (supra), serve to elevate the permissible level of police intrusion from a mere "request for information” to the more intrusive "common-law right [of] inquir[y].” (People v De Bour, 40 NY2d, supra, at 223.) First, Officer DeFelice observed the defendant and Mr. Daise engaging in activity resembling "steering,” whereby Mr. Daise first exchanged money with each of the individuals who approached, and then pointed to Mr. King, who engaged in "hand-to-hand” transactions with each of these individuals. While this activity is "[capable of] innocent interpretation” (see, People v Wilson, 175 AD2d, supra, at 18), it is furtive behavior frequently associated with drug sales.
In addition to observing the defendant and Mr. Daise engaging in activity which appeared to be "steering,” Officer DeFelice also observed one or two of the individuals who approached Albert King put an unseen object in their mouth after engaging in a "hand-to-hand” transaction with the defendant. This placement of the unidentified object received from the defendant in the mouth, while capable of innocent interpretation, is somewhat analogous to the "sniffing” of an unseen object by drug purchasers in People v Bittner (97 AD2d 33 [2d Dept 1983];[4] see also, People v Owens, 155 AD2d 696 [2d *580 Dept 1989]).[5] However, while the officer in Bittner testified that such "sniffing” was frequently associated with drug transactions involving angel dust, in the instant case the People did not present any evidence demonstrating why the individuals’ placement of the object received from Albert King in their mouths was indicative of the sale of vials of crack. Officer DeFelice merely mentioned the occurrence of this activity during the course of his testimony, but did not state that it raised his suspicion, or apprise this court of what possible significance such activity might have. [6] Nevertheless, in light of Owens and Bittner, this court finds that the placement of the unseen object in the mouth was a factor which, when considered together with the above-described "hand-to-hand” transactions and the activity resembling "steering”, served to elevate the permissible level of police intrusion from the minimal "request for information” permitted in Wilson (supra, at 17) and Kevin W. (supra, at 302) to the more intrusive "common-law right [of] inquir[y].” (People v De Bour, 40 NY2d 210, 223, supra.)
Having determined the level of intrusive activity Officer DeFelice was permitted to engage in as a result of his observations, this court must now determine whether he properly exercised his common-law right of inquiry, which grants the police the right "to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure.” (People v De Bour, supra, at 223.) The purpose of this limited interference is to "either confirm or *581 refute” the officer’s " 'founded suspicion that criminal activity is afoot.’ ” (People v Taveras, 155 AD2d 131, 135 [1st Dept 1990], lv denied 76 NY2d 871 [1990], quoting People v De Bour, supra, at 223.) This level of contact permits the police to ask "accusatory” questions of an individual, as well as to request permission to search that individual’s person or belongings. (See, e.g., People v Hollman, 79 NY2d 181 [1992], supra; People v Howard, 50 NY2d 583 [1980]; People v Carrasquillo, 54 NY2d 248 [1981].)
By ordering Albert King to open his hand, without any initial request or inquiry, Officer DeFelice exceeded the bounds of a common-law right of inquiry under De Bour’s level II. This "authoritative act * * * with which defendant immediately complied”, cannot be construed as an inquiry, since there is "[no] responsive answer to be given, as [there] would be in a true request for information.” (People v Taveras, supra, at 136-137, n 5.) Officer DeFelice could have lawfully questioned Albert King as to the contents of his hand, or even asked him to open it. (People v Hollman, supra; People v Howard, supra; People v Carrasquillo, supra.) Further intrusion may then have been warranted, depending upon the defendant’s response to such questioning. However, Officer DeFelice could not immediately order the defendant to open his hand without any initial inquiry. (See, e.g., People v Carrasquillo, supra, at 253 [in holding that officer properly exercised his common-law right of inquiry, Court emphasized that "while the defendant was asked what was contained in the bag, there was no demand that he open it or hand over its contents”] [emphasis added]; People v Taveras, supra, at 136-137.)[7]
The People urge this court to find that the defendant impliedly consented to the search of his hand. The facts in this case cannot support such a finding. Since several uniformed officers approached the defendant, with one ordering *582 him to open his hand, any such "consent” was involuntary and "constituted 'a yielding to overbearing official pressure.’ ” (People v Irizarry, 168 AD2d 377, 379 [1990], affd 79 NY2d 890 [1992], quoting People v Gonzalez, 39 NY2d 122, 124 [1976]; see also, Bumper v North Carolina, 391 US 543 [1968]; People v Whitehurst, 25 NY2d 389 [1969].)
Finally, defendant’s statements must be suppressed as the fruit of illegal police conduct which resulted in his unlawful arrest. (Wong Sun v United States, 371 US 471, 486-488 [1963]; Dunaway v New York, 442 US 200, 216-218 [1979]; People v Taveras, supra, at 138 [defendant’s statement suppressed as illegal fruit of unlawful arrest despite the fact that hearing court determined it to be a spontaneous utterance].)
Therefore, the defendant’s motion is granted in all respects.

. Bernard Daise was arrested along with the defendant on January 11, 1992. On April 4, 1992, a bench warrant was issued for Mr. Daise in Part 50, Supreme Court, Criminal Term, New York County.

. Officer DeFelice did not say that he actually saw the defendant exchange an object. Instead, by virtue of the "hand-to-hand” transactions, it "appeared” that Albert King had given something to the individual.

. The People have not presented sufficient evidence to establish that the area surrounding the Port Authority Bus Terminal at 10:10 p.m. on a Saturday night is properly characterized as a "drug prone location.” Officer DeFelice testified that at that time of night the area is bustling with people coming from and going to the terminal, stores, a newsstand on the comer of Eighth Avenue and 42nd Street, and nearby Broadway theaters and movie houses. While it is undeniable that many drug sales occur in that vicinity, this court is not prepared, based upon the evidence presented, to find that otherwise innocent behavior becomes more suspicious because it occurs at 42nd Street and Eighth Avenue at 10:10 p.m. on a Saturday night.

. In Bittner (supra), the officer observed two identical transactions in which the defendant, who was seated with two companions in a car, passed an unseen object to individuals in exchange for money. These individuals then held the object up to their nose and "appeared to be smelling it” (at 34). The officer testified that he had made numerous arrests involving angel dust, and that it was his experience that "buyers of angel dust generally sniff it prior to making their purchases” (at 38). The Court found that probable cause existed based on the totality of the circumstances: the sniffing of the unseen object, the exchange of money, the fact that two identical transactions had occurred within a short period of time, and the fact that these transactions occurred in a drug-prone location. (Supra.)

. In Owens (supra), the arresting officer observed, via binoculars, the defendant and a companion standing in the foyer of an apartment building where the officer had previously made numerous drug-related arrests. While the door to the apartment building remained closed, the officer observed four transactions at approximately 1:40 a.m., whereby the defendant’s cohort exchanged unseen objects for currency through an opening in the door from which a pane of glass was missing. At least one of the buyers put the object in his mouth (at 697). However, in finding that probable cause existed, the Second Department did not cite the placement of the object in the mouth as a factor which gave rise to probable cause. (Supra.) Moreover, the "hand-to-hand” transactions in the instant case, which took place on a well-lit street in a busy area, do not give rise to the same inference of illicit activity as those in Owens, which occurred in the early morning hours through an opening in the door of a known drug location.

. Although the People concede that "the placing of an object in one’s mouth is not considered a 'telltale’ sign of drug activity,” they urge that such action is an attempt to conceal the item, and that it therefore "gives a fair indication that the object purchased is a crack vial.” However, they have presented no evidence or explanation to support that conclusion.

. The People do not contend that the officer feared for his safety or believed that the defendant was armed or in any way dangerous. (See, e.g., People v Taveras, supra, at 137-138; People v Oppedisano, 176 AD2d 667 [1st Dept 1991], lv denied 79 NY2d 1052 [1992]; People v Nicolas, 171 AD2d 817 [2d Dept 1991].) As such, even assuming, arguendo, that Officer DeFelice "reasonably suspected” — level III — Albert King of criminal activity, and could therefore lawfully execute a forcible stop, he nevertheless could not search or even frisk him absent, in addition, a "reasonable fear that he was in danger of physical injury by virtue of the defendant being armed.” (People v McNatt, 65 NY2d 1046, 1048 [1985]; see also, Sibron v New York, 392 US 40 [1968].)